UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

GREGORY A. FIGEL,

        Plaintiff,

v.                                    Case No. 2:05-cv-189
                                       HON. ROBERT HOLMES BELL

DANIEL STASEWICH, et al.,

        Defendants.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Gregory A. Figel, an inmate at the Baraga Maximum Correctional Facility, filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against 21 defendants who are employed at the Alger Maximum Correctional Facility.  Defendants include Corrections Officers Daniel Stasewich, Joseph Suardini, Jason Savera, William Johnson, Unknown Irvine, Unknown Semasky, Unknown Maxon, Unknown Charlebois, Lou Miron, K. Hill, and D. Olger, Sergeants J. Adams and James Rankin, Maintenance Workers Unknown Johns and T. Seymour, Maintenance Supervisor Randy Zamaron, Grievance Coordinator Wayne Trierweiler, Librarian S. Salter, Case Manager Denver McBurney, Resident Unit Manager Catherine Bauman, and Warden Barbara Bouchard.

Plaintiff alleges in his complaint that on November 1, 2003, Defendant Stasewich informed plaintiff that Assistant Deputy Warden (ADW) Gramm and ADW Bobo told Stasewich that Plaintiff would never be released to general population because they "despise prisoners who rat on police."  Plaintiff alleges that on December 23, 2003, Defendants Savera, Irvine, Johnson, Semasky, Maxon and Suardini all refused to sign Plaintiff's release papers because of litigation that

Plaintiff had filed against staff.  This alleged retaliatory act was organized by Defendants Stasewich and Suardini with Defendant Bouchard's knowledge.  On that same date, Defendant Bouchard refused to allow Plaintiff to have an emergency telephone call with Plaintiff's father who had suffered a heart attack.  Allegedly, on February 11, 2004, Defendants Stasewich and Suardini blocked the ventilation system in Plaintiff's cell.  Plaintiff alleges that Defendants Suardini and Stasewich put poison in his food. Defendant Suardini attempted to get prisoner Mike Hyde to file a fabricated statement to use against Plaintiff in one of his lawsuits.  On March 29, 2004, Plaintiff alleges that Defendants Suardini, Rankin and Irvine moved him off A-Wing so that Plaintiff could no longer assist prisoner Kilpatrick in filing a lawsuit against Suardini.  Defendant Suardini then wrote a misconduct ticket for possession of dangerous contraband when he found an ink pen in Plaintiff's cell during the move.  Plaintiff was moved to a cell without ventilation on March 20, 2004.  Poison was then placed in Plaintiff's food.  Plaintiff gave Hearing Investigator Olger information, including past complaint filings and witness lists, that Plaintiff alleges Olger destroyed and never gave to the hearing officer.  Plaintiff complains that RUO Savera refused to help Plaintiff get the ventilation working properly in Plaintiff's cell.  Allegedly, on April 2, 2004, Defendant Suardini poisoned Plaintiff's food.

On April 7, 2004, Defendants Savera and Hill retaliated against Plaintiff by writing an insolence ticket against him.  Plaintiff alleges that on April 21, 2004, he filed a grievance against Defendant Stasewich for assault and battery.  Plaintiff alleges that Defendants Suardini and Stasewich have tried to have prisoners "put a hit out on my life."  Plaintiff allegedly filed a grievance against Defendants Suardini and Seymour for tampering with Plaintiff's toilet which caused a sewage backup in his cell.  Plaintiff filed a grievance against Defendant Seymour for refusing to fix Plaintiff's ventilation.  Plaintiff filed a grievance against Defendant Savera because he lied about the

nurse making rounds and refused to get Plaintiff's medication.  On June 18, 2004, Defendant Charlebois refused to notify health care so that Plaintiff could get his medicine.  Plaintiff filed a grievance on June 21, 2004, against Defendants Savera, Hill and Seymour for retaliation, because they lied to administration about Plaintiff's ventilation.  Plaintiff filed a grievance against Defendant Savera for tampering with his mail and for refusing to provide him with dental floss.

Allegedly on June 29, 2004, Defendant Trierweiler informed Plaintiff that he earned 90 days modified access because he continued to whine and complain about every little thing. Plaintiff alleges that on other occasions he was placed on modified access by Defendant Treirweiler. Plaintiff explains that during a 30-day period ending on May 29, 2004, he sent approximately 60 letters to Defendant Trierweiler requesting grievance forms.  Defendant Trierweiler refused to respond to more than 50 of the requests.

Plaintiff alleges that he filed a retaliation grievance against Defendant Savera for refusing to get Plaintiff his medication.  On July 7, 2004, Defendant Bauman wrote a notice of intent to conduct an administrative hearing for violating a legal agreement to prevent Plaintiff from engaging in litigation activities.  Plaintiff alleges that he filed a grievance against Defendant Seymour for leaving Plaintiff in his cell without adequate ventilation.  Plaintiff alleges that on July 13, 2004, he filed a grievance on Defendant Savera because Savera refused to get Plaintiff's medication in retaliation for past grievance filings.  On July 14, 2004, Plaintiff filed a grievance on Defendant Savera after Savera handed Plaintiff a two inch piece of dental floss stating, " I know about the floss grievance so this is what you will get from now on."  Defendant Savera then told Plaintiff that he was never going to get out of the hole until Plaintiff stopped filing grievances and lawsuits.

On July 15, 2004, Plaintiff filed a grievance against Defendant Savera for tampering with the toilet pressure gauge and causing feces to back-up into plaintiff's cell.  On July 17, 2004, Plaintiff attempted to file a grievance against Defendant Savera for refusing him dental floss, but the grievance was rejected by Defendant Trierweiler.  On July 18, 2004, Plaintiff filed another grievance against Defendant Savera for refusing to do a monthly interview for release to general population. On July 24, 2004, Plaintiff attempted to file grievances against Defendant Savera because he had refused to provide dental floss, but Defendant Trierweiler initially refused to respond to the grievance requests and then denied them as untimely.  Plaintiff filed a grievance against Defendant Savera because Savera allegedly had the barber give Plaintiff a terrible haircut.  Plaintiff filed a grievance against Defendant Savera on August 2, 2004, because he feared retaliation after Savera was reprimanded by Sergeant Castello for not reviewing Plaintiff's segregation placement.

On August 11, 2004, Plaintiff alleges that Defendant Charlebois sexually assaulted him during a shakedown.  Plaintiff filed another grievance against Defendant Savera for tampering with Plaintiff's mail.  Plaintiff filed a grievance against Defendant Stasewich, on September 19, 2004, for telling Plaintiff that his case was going nowhere and that all the officers knew the magistrate assigned to the case.  On October 13, 2004, Plaintiff filed a grievance on Defendant Miron because he told Plaintiff a tag would look good on Plaintiff's toe, and that if Plaintiff did not drop the lawsuit he was going to leave the prison in a body bag.  Plaintiff filed a grievance on October 18, 2004, against Defendant Miron for keeping Plaintiff from returning to the general population, solely because of grievance and lawsuit filings against Defendants Suardini and Stasewich. Defendant Miron allegedly fabricated a misconduct ticket against Plaintiff for dangerous contraband by putting floor stripper in Plaintiff's soap bottle.  Plaintiff filed another grievance against Defendant Stasewich on November 14, 2004, claiming that Defendant Stasewich told him

that he had destroyed Plaintiff's legal papers and grievance appeals.  On December 29, 2004, Plaintiff filed a grievance on Defendants Zamoron and Adams for leaving Plaintiff in a cell with excessive heat for more than a month.  On January 11, 2005, Plaintiff filed a grievance against Defendant Johns for retaliation and cruel and unusual punishment because when Plaintiff complained that the temperature in his cell was 83 degrees, Defendant Johns shut the heat and ventilation off in Plaintiff's cell.  On February 15, 2005, Defendant Trierweiler came to Plaintiff's cell and placed him on modified access to the grievance procedures.  As a result, Plaintiff filed another grievance on February 20, 2005, against Defendant Trierweiler and the Warden.  On February 24, 2005, Plaintiff filed a grievance against Defendant Salter for refusing to photocopy Plaintiff's legal exhibits in retaliation.  On February 25, 2005, Plaintiff chipped his tooth while eating his breakfast cereal on what appeared to be a rock in the cereal.  Defendant Miron told Plaintiff that the rock was a gift from staff.  On April 3, 2005, Plaintiff filed a grievance on Defendants Bauman, McBurney and Salter for retaliating against Plaintiff by interfering with his access to the courts and causing Plaintiff to miss a court deadline.

Plaintiff alleges that defendants violated his First Amendment rights of free speech and access to the courts by retaliating against him for filings complaints and grievances. Plaintiff asserts a violation of his due process rights and his Eighth Amendment right to be free from cruel and unusual punishment.  Plaintiff is seeking compensatory and punitive damages, as well as injunctive relief.

Presently before the Court is the Defendants' Motion for Summary Judgment, pursuant to Fed. R. Civ. P. 56.  Plaintiff has filed a response and the matter is ready for decision. Because both sides have asked that the Court consider evidentiary materials beyond the pleadings, the standards applicable to summary judgment apply.  *See* Fed. R. Civ. P. 12(b).

Summary judgment is appropriate only if the moving party establishes that there is no genuine issue of material fact for trial and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). If the movant carries the burden of showing there is an absence of evidence to support a claim or defense, then the party opposing the motion must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Id.* at 324-25. The nonmoving party cannot rest on its pleadings but must present "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The evidence must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Thus, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true. *Muhammad v. Close***,** 379 F.3d 413, 416 (6th Cir. 2004) (*citing Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994)). However, a mere scintilla of evidence in support of the nonmovant's position will be insufficient. *Anderson*, 477 U.S. at 251-52. Ultimately, the court must determine whether there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. *See also Leahy v. Trans Jones, Inc.*, 996 F.2d 136, 139 (6th Cir. 1993) (single affidavit, in presence of other evidence to the contrary, failed to present genuine issue of fact); *cf. Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1448 (6th Cir. 1993) (single affidavit concerning state of mind created factual issue).

Defendants assert that Plaintiff has failed to show that Defendants' conduct violated his rights under the United States Constitution. Plaintiff claims that Defendants violated his constitutional rights when they labeled him a snitch, when they tampered with and poisoned his food, when they deprived him of heat and ventilation and/or tortured him with excessive heat, when they assaulted him sexually and otherwise, when they caused urine and feces to backwash into his cell,

when they denied him medication, when they denied him dental floss, when they repeatedly threatened him, when they denied him a monthly review, when they orchestrated a terrible haircut, and when they caused Plaintiff to chip his tooth.

Plaintiff claims that Defendants' conduct violated his rights under the Eighth Amendment. The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged "must result in the denial of 'the minimal civilized measure of life's necessities.'" *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich* , 148 F.3d 596, 600-601 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348. Moreover, "Not every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

Plaintiff also claims that Defendants' conduct was motivated by a desire to retaliate against him for filing grievances and lawsuits. Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir.1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Thaddeus-X*, 175 F.3d at 394.

- 7 -

Moreover, Plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

In their affidavits, Defendants Suardini and Stasewich deny poisoning Plaintiff's food or blocking off the ventilation to his cell.  (*See* Defendants' Exhibits L and R.)  In Plaintiff's claim regarding the alleged tampering with his food, Plaintiff's grievance indicates that on the pertinent dates, his tray appeared to have been tampered with and, after he ate, he became very ill.  (*See* Exhibits A-22 through 25, A-34 through A-37, and A-44 through A-45, which are attached to Plaintiff's complaint.)  Plaintiff also refers to several health care requests and affidavits from other prisoners who claim to have experienced similar problems with Defendant Stasewich.  (*See* Exhibits C-77 through C-131, which are attached to Plaintiff's response to the motion for summary judgment.)  However, Plaintiff fails to attach copies of any medical records showing that he was, in fact, suffering from the effects of poisoning.  Nor does Plaintiff claim to have witnessed the alleged poisoning.  Therefore, because Plaintiff has failed to show that there is a genuine issue of material fact regarding whether Defendants poisoned Plaintiff's food, the undersigned recommends that they be granted summary judgment on this claim.  Moreover, the undersigned opines that Defendants are entitled to summary judgment on Plaintiff's claim that he broke a tooth because of a rock in his cereal because Plaintiff has failed to allege any facts showing that the named Defendants were responsible.

With regard to Plaintiff's claim that Defendants Rankin, Irvine and Suardini put him in a cell without ventilation, Defendants state that Plaintiff was moved from one cell to another as part of a routine move for security reasons.  Defendants Rankin, Suardini, and Irvine attest that the

cell was inspected by staff and was found to be in good condition. (*See* Defendants' Exhibits I, L and O.) Defendants Suardini, Savera and Seymour also deny ever tampering with Plaintiff's toilet gauge and causing waste to backwash into Plaintiff's cell. (*See* Defendants' Exhibits L, S and V.)

Defendant Seymour attests that the ventilation and heat in the cells are monitored in the mechanical room through the prison's "preventative maintenance program," and that any problems are resolved immediately. Defendant Seymour states that on June 21, 2004, the ventilation was checked, the filters were changed, and the heating coils were cleaned. (*See* Defendants' Exhibit V.) Defendant Seymour further attests that Plaintiff "states the air exchange was 50 cfm" and that Plaintiff wanted the air exchange to be over 100 cfm. However, Defendant Seymour states that according to the Physical Plant Indoor Air Quality Standard 4-4151, 15 cfm is the minimum required for a cell. (*See* Defendants' Exhibit V.) Defendant Seymour attests that the housing unit does not have air conditioning, so that the cell temperature on July 10, 2004, would have been based on the temperature outside. (*See* Defendants' Exhibit V.) Defendants Johns and Zamaron attest that on January 10, 2005, maintenance staff received work order #28569, which was submitted by Defendant Rankin, requesting that the heat be turned down in Birch Unit as some of the cells were registering in the 80s. Defendant Johns completed the work order on January 12, 2005. (*See* Defendants' Exhibits M and P.)

In response to this contention, Plaintiff merely refers to grievances he filed on this issue, as well as the responses, which are attached to his underlying complaint. However, none of the attached grievances do anything more than assert the allegations in his complaint. The responses to Plaintiff's grievances support Defendants' assertion that Plaintiff's concerns were addressed and that no Eighth Amendment violation occurred. (*See* Exhibits A-18 through A-21, A-30 through A-33, A-40 through A-43, A-64 through A-68, A-78 through A-83, A-115 through A-119, and A-177

through A-181, which are attached to Plaintiff's complaint; and Exhibits C-325 through C-352, which are attached to Plaintiff's response in opposition to the motion for summary judgment.) After reviewing the record, the undersigned concludes that Plaintiff has failed to show a genuine issue of material fact with regard to his claim and recommends that Defendants be granted summary judgment on this issue.

Defendants assert that Plaintiff's remaining claims are based on pure speculation and are unsupported by any factual allegations. Defendants contend that Plaintiff merely assumed that Defendants Suardini and Seymour tampered with a "non-existent" toilet gauge and intentionally caused waste to backwash into Plaintiff's cell. In Plaintiff's step I grievance on this issue, he states:

> I am filing this grievance because my toilet is not working properly. It is creating a health hazard. When other prisoners flush their toilets the waste back washes into my toilet. Unit staff can tamper with the pressure gauges and intentionally cause this to happen because I heard maintenance man Seymore [sic] explain the process to RUO Suardini. This is a major health hazard because I have to use this toilet and this act of retaliation is putting me at risk to catch HIV or Hepatitis.

(*See* Exhibit A-60 to Plaintiff's original complaint.)

In the step I response, Defendant Rankin stated that Maintenance had adjusted the water flow to Plaintiff's toilet, but it appeared that the problem was persisting. Defendant Rankin further indicated that a second work order had been submitted on the issue and that custody staff were not permitted to do maintenance duties. Plaintiff filed a step II appeal, stating that although maintenance had fixed his toilet, someone had tampered with it again and he had other prisoners' urine and feces backing up into his cell. According to the step II response to this grievance, a work order had been sent and Plaintiff's toilet had been fixed on May 26, 2004. Plaintiff then filed a step III appeal, in which he stated that his toilet was never fixed on May 26, 2004, and that waste from other prisoners was still backing up into Plaintiff's toilet. Plaintiff also questioned "[w]hy would

Seymore [sic] fix it when he is the same one teaching staff how to do this when they want to mess with a prisoner."  (*See* Exhibit A-60.)  In the step III response, Jim Armstrong states:

> This investigator has reviewed the documents presented with the appeal to Step Three and contacted LMF for additional information. LMF reported the Grievant's toilet was fixed on May 26, 2004.  They have not received any further complaints from the Grievant regarding this issue.  If the Grievant is continuing to have problems with his toilet, he should report them to housing unit staff.

(*See* Exhibit A-60 to Plaintiff's original complaint.)

Plaintiff also attaches a copy of a request to file a grievance while on modified access dated August 10, 2004, which states that on July 15, 2004, at approximately 6:00 p.m., Defendant Savera went into the ventilation closet next to Plaintiff's cell and said, "Figel I warned you to stop filing the complaints and grievances on me and today I find out that you just filed several more complaints on me, so for the rest of your stay in this unit you are gonna be smelling other peoples' piss and shit."  Defendant Savera then tampered with Plaintiff's pressure gauge to cause other prisoners urine and feces to back wash into Plaintiff's cell.  (*See* Exhibits A-128 and A-129 to Plaintiff's original complaint; and Exhibits C-373 through C-378, which are attached to Plaintiff's response in opposition to the motion for summary judgment.)  Based on the evidence in the record, it appears that there is a genuine issue of material fact with regard to whether Defendants Suardini and Seymour tampered with Plaintiff's toilet in order to cause feces and urine to backup into Plaintiff's cell in retaliation for Plaintiff's use of the grievance system.  Therefore, it does not appear that Defendants are entitled to summary judgment on this claim.

As noted above, Plaintiff claims that he was deprived of his medications on certain dates in violation of his constitutional rights.  Plaintiff attaches copies of grievances and responses which state that Defendants Savera and Charlebois refused to inform health care of his need for

medication on June 14, 2004, June 18, 2004, July 2, 2004, and July 13, 2004.  (*See* Exhibits A-69 through A-77, A-101 through A-104, and A-120 through A-123 to Plaintiff's original complaint.) Defendants Savera and Charlebois both attest that they informed Health Services when Plaintiff asked for his medication.  (*See* Defendants' Exhibits G and S.)  The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency.  *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976).  The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner.  *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious.  *Id.*  In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.*  The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person."  *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004).  If, however the need involves "minor maladies or non-obvious complaints of a serious need for medical care," *Blackmore*, 390 F.3d at 898, the inmate must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Napier v. Madison County, Ky.*, 238 F.3d 739, 742 (6th Cir. 2001).  As noted by Defendants, Plaintiff has failed to come forward with any evidence showing that his medical need was serious.  Moreover, Plaintiff has failed to show that he suffered from a detrimental effect of the alleged denial of medication by Defendants Savera and Charlebois.  Therefore, the undersigned

recommends that Defendants be granted summary judgment on Plaintiff's Eighth Amendment claim regarding the denial of medications.

Plaintiff also claims that the denial of medications violated his First Amendment right to be free from retaliation. Plaintiff must show that an allegedly adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct. *Thaddeus-X*, 175 F.3d at 394. The undersigned concludes that because Plaintiff is unable to show that his need for medication was serious or that he suffered as a result this denial, such conduct would not deter a person of ordinary firmness from filing grievances and lawsuits. Therefore, Defendants are entitled to summary judgment on Plaintiff's retaliation claim regarding the denial of medications.

Plaintiff further contends that Defendants retaliated against him by denying him release to the general population. In support of this claim, Plaintiff alleges that in January, June, and November of 2002, Defendants working at LMF submitted "RPA papers requesting that Plaintiff be released" to the general population. These requests were denied by Assistant Deputy Warden Epps, Deputy Warden Bergh and "RPA" MacMeekin. In May of 2003, Defendants Stasewich and Suardini tried to get Plaintiff to put a hit out on Prisoner Michael Eisner #226105, telling Plaintiff that they would take good care of him and continue to try and get him released to the general population. Plaintiff refused and filed a complaint on Defendants Stasewich and Suardini. Defendants Stasewich and Suardini then became upset and "retaliated against Plaintiff on numerous occasions." Consequently, Plaintiff filed a lawsuit on them. (*See Figel v. Suardini, et al.*, 2:03-cv-206 (W.D. Mich.))

On November 1, 2003, Defendant Stasewich told Plaintiff that Assistant Deputy Wardens Gramm and Bobo indicated that Plaintiff would never get approved to be released to the general population as long as he was at LMF because Plaintiff was a "rat," and that Defendant

Bouchard approved of this action.  Plaintiff alleges that LMF policy requires at least two Resident Unit Officers to sign Plaintiff's RPA papers before his request for release to general population could be sent back to the administration for review.  From November 1, 2003, until December 23, 2003, Plaintiff talked with Defendants Savera, Irvine, Johnson, Semasky, Maxon, Suardini and McBurney about requesting release to the general population, but each Defendant refused to sign the request.  On December 27, 2003, Defendant Semasky told Plaintiff that he would not sign the papers because of the lawsuit on Defendant Suardini and other staff.  On January 23, 2004, Defendant Stasewich stated, "I told you we would block that release and I was already promised that it will never make it pass [sic] the ADW's - you are gonna grow old in the Hole Rat."  Plaintiff claims that on July 14, 2004, Defendant Savera told Plaintiff that he was never going to get out of the hole unless he stopped filing grievances and lawsuits on staff and Defendants had all agreed during a meeting to keep Plaintiff in segregation.  On October 13, 2004, Plaintiff asked Defendant Miron why he was trying to keep Plaintiff from being released to the general population.  Defendant Miron replied that because he had snitched on Defendants Suardini and Stasewich the previous year, they had asked all staff to block Plaintiff's release.  Plaintiff attaches a statement signed by a number of inmates who claim to have heard Defendants make the above statements, and copies of numerous grievances and responses in support of this claim.  (*See* Plaintiff's Exhibits C-3, A-14 through A-17, A-24 through A-27, A-61 through A-64.)  Based on the above, the undersigned concludes that Plaintiff has shown the existence of a genuine issue of material fact with regard to Plaintiff's retaliation claims against Defendants Bouchard, Stasewich, Savera, Irvine, Johnson, Semasky, Maxon, Suardini and McBurney for refusal to recommend Plaintiff for release to general population.

In addition, Plaintiff offers copies of his grievance, appeals and responses stating that Defendant Stasewich assaulted him on April 21, 2004, by striking him with the D-ring attached to

the end of Plaintiff's restraints, causing Plaintiff to suffer a "serious ankle and foot injury." (*See* Exhibits A-50 through A-54 to Plaintiff's original complaint.) Plaintiff also attaches copies of a health care request, and medical progress notes, indicating that Plaintiff suffered bruising and some swelling to the area. Finally, Plaintiff offers the affidavits of prisoners Melvin Thomas and J. G. Sarah, who claim to have witnessed Defendant Stasewich intentionally strike Plaintiff with the restraints and laugh about it. (*See* Exhibits C-367 through C-370, which are attached to Plaintiff's response in opposition to the motion for summary judgment.) A review of the record in this case reveals that Plaintiff has succeeded in raising a genuine issue of material fact with regard to this claim. Therefore, the undersigned recommends that Defendants be denied summary judgment on this issue.

Plaintiff claims that Defendant Charlebois sexually assaulted him by improperly rubbing his genital area during a shakedown and told Plaintiff to walk down the center of the walkway so everyone could see Plaintiff's "pretty white" behind. Plaintiff refers to copies of a grievance, appeals, and responses he wrote on Defendant Charlebois for allegedly sexually assaulting him by rubbing his penis during a shakedown on August 11, 2004. (*See* Exhibits A-143 through A-147 to Plaintiff's original complaint.) Defendant Charlebois attests that on the date in question, he let Plaintiff out of his cell for a shower. Defendant Charlebois further states that because of the numerous assaults that take place during showers, he does a thorough shakedown on all prisoners that he takes to the showers. Defendant Charlebois attests that prisoners sometimes try to hide contraband in the waistband of their shorts, which is why he made a "sweep" across Plaintiff's waistband during the shakedown. Defendant Charlebois told Plaintiff to move to the center of the walk because allowing Plaintiff to walk close to the cells along the sides of the walk would have

placed Plaintiff at risk of being assaulted by the prisoners in the cells along the way.   (*See* Defendants' Exhibit G.)

The Sixth Circuit addressed a claim much like that being asserted in this case in *Jackson v. Madery*, 158 Fed. Appx. 656, 662 (6th Cir. Nov. 17, 2005).  In *Jackson*, the Sixth Circuit looked to the Second Circuit in its analysis of the issue.   The *Jackson* court stated:

> The Second Circuit, among other circuits, has held that "sexual abuse of a prisoner by a corrections officer may in some circumstances violate the prisoner's right to be free from cruel and unusual punishment." *Boddie v. Schnieder,* 105 F.3d 857, 860-61 (2d Cir.1997). *See also Freitas v. Ault,* 109 F.3d 1335, 1338 (8th Cir.1997); *Jordan v. Gardner,* 986 F.2d 1521, 1524-31 (9th Cir.1993) (en banc). The Second Circuit stated that "there can be no doubt that severe or repetitive sexual abuse of an inmate by a prison officer can be 'objectively, sufficiently serious' enough to constitute an Eighth Amendment violation." *Boddie,* 105 F.3d at 861. In *Boddie,* the plaintiff, a male prisoner, alleged that a female prison guard squeezed his hand, touched his penis, and made sexually suggestive comments, and on a separate occasion told him to take off his sweatshirt and twice pinned him to a door with her body. *Id.* at 859-60. The Second Circuit concluded that "[n]o single incident that he described was severe enough to be 'objectively, sufficiently serious.' Nor were the incidents cumulatively egregious in the harm they inflicted." *Id.* at 861. The alleged incidents, the court held, did "not involve a harm of federal constitutional proportions." *Ibid.* The alleged episode at issue here was isolated, brief, and not severe. While certainly to be condemned if true, it did not rise to the level of a violation of Jackson's constitutional right to be free from cruel and unusual punishment.
>
> Nor can the incident constitute the basis for a retaliation claim against Madery, for it fails to amount to a chilling adverse action. It would not, either alone or taken together with the alleged verbal threats against Jackson by Madery, deter a person of ordinary firmness from pursuing a lawsuit or administrative grievances.

*Jackson*, 158 Fed. Appx. at 662.

The undersigned notes that Plaintiff in this case, as in *Jackson*, is asserting that he was subjected to a solitary incident involving improper touching and inappropriate comments.  For the

- 16 -

reasons set forth by the Sixth Circuit in *Jackson*, the undersigned recommends that Defendants be granted summary judgment on Plaintiff's sexual assault claims against Defendant Charlebois.

Finally, Plaintiff claims that Defendants retaliated against him and violated his Eighth Amendment rights by denying him dental floss, making numerous threats against him, and orchestrating a "terrible haircut." The undersigned notes that claims of abusive language, or of general harassment, do not state an Eighth amendment or substantive due process violation. *Ivey v. Wilson*, 832 F.2d 950 (6th Cir. 1987);; *Ishaaq v. Compton*, 900 F. Supp. 935, 944 (W.D. Tenn., 1995); *Meadows v. Gibson*, 855 F. Supp. 223, 225 (W.D. Tenn., 1994); *Banks v. Klapish*, 717 F. Supp. 520 (W.D. Mich. 1989); *Gilson v. Cox*, 711 F. Supp. 354 (E.D. Mich. 1989); *Rahman v. Stephenson*, 626 F. Supp. 886, 888 (W.D. Tenn. 1986). Even the occasional or sporadic use of racial slurs, although unprofessional and reprehensible, does not rise to a level of constitutional magnitude. *See*, *Torres v. County of Oakland*, 758 F.2d 147, 152 (6th Cir. 1985). Moreover, the undersigned concludes that the denial of dental floss and the infliction of a terrible haircut are not sufficiently egregious to rise to the level of an constitutional violation.

Defendants maintain that they are entitled to summary judgment on Plaintiff's due process claims. Plaintiff alleges that on March 29, 2004, Defendant Suardini wrote a misconduct ticket for possession of dangerous contraband when he found an ink pen in Plaintiff's cell during a move. Plaintiff states that on March 31, 2004, Defendant Olger came to his cell to investigate the misconduct ticket. Plaintiff alleges that he gave Defendant Olger a list of witnesses, a list of questions for his witnesses, a list of relevant documents, his affidavit, copies of a memo dated April 15, 2003, from Inspector Rutter to Suardini, Stasewich and Smith re: Prisoner Eisner, copies of a civil rights complaint captioned *Kilpatrick v. Suardini, et al.*, and a "Certificate of Prisoner Institutional/Trust Fund Account Activity relating to the *Kilpatrick* action dated March 24, 2004.

- 17 -

Plaintiff claims that he was informed by Hearing Officer Maki that she never received copies of the civil rights complaint, the Inspector Rutter memo, or the prisoner account statement.  Plaintiff assumes that Defendant Olger destroyed those documents.

Plaintiff's due process claim against Defendant Olger is barred by the doctrine of *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled in part* by *Daniels v. Williams*, 474 U.S. 327 (1986).  Under *Parratt*, a person deprived of property by a "random and unauthorized act" of a state employee has no federal due-process claim unless the state fails to afford an adequate post-deprivation remedy.  If an adequate post-deprivation remedy exists, the deprivation, although real, is not "without due process of law."  *Parratt*, 451 U.S. at 537.  This rule applies to both negligent and intentional deprivation of property, as long as the deprivation was not done pursuant to an established state procedure.  *See Hudson v. Palmer*, 468 U.S. 517, 530-36 (1984); *Mitchell v. Fankhauser*, 375 F.3d 477, 483-84 (6th Cir. 2004).  Because Plaintiff's claim is premised upon allegedly unauthorized negligent acts of a state official, he must plead and prove the inadequacy of state post-deprivation remedies.  *See Copeland v. Machulis*, 57 F.3d 476, 479-480 (6th Cir. 1995); *Gibbs v. Hopkins*, 10 F.3d 373, 378 (6th Cir. 1993).  Under settled Sixth Circuit authority, a prisoner's failure to sustain this burden requires dismissal of his § 1983 due-process action.  *See Brooks v. Dutton*, 751 F.2d 197 (6th Cir. 1985).

Plaintiff has not sustained his burden in this case.  Plaintiff has not alleged that state post-deprivation remedies are inadequate.  Moreover, numerous state post-deprivation remedies are available to him.  First, a prisoner who incurs a loss through no fault of his own may petition the institution's Prisoner Benefit Fund for compensation.  MICH. DEP'T OF CORR., Policy Directive 04.07.112 ¶ II(B) (effective Sept. 24, 1998).  Aggrieved prisoners may also submit claims for property loss of less than $1,000 to the State Administrative Board.  MICH. COMP. LAWS § 600.6419;

Policy Directive, 04.07.112 ¶ II(B).  Alternatively, Michigan law authorizes actions in the Court of Claims asserting tort or contract claims "against the state and any of its departments, commissions, boards, institutions, arms, or agencies."  MICH. COMP. LAWS § 600.6419(1)(a); *see Green v. State Corrections Dep't*, 192 N.W.2d 491 (Mich. 1971) (state liable for tortuous injury sustained by a sentenced convict at the Detroit House of Correction).  The Sixth Circuit has specifically held that Michigan provides adequate post-deprivation remedies for deprivation of property.  *See Copeland*, 57 F.3d at 480.  Plaintiff does not allege any reason why a state-court action would not afford him complete relief for the deprivation, either negligent or intentional, of his personal property. Accordingly, the undersigned recommends that Defendant Olger be granted summary judgment on Plaintiff's due process claim.

Plaintiff also claims that Defendants Savera, Suardini and Miron violated his due process rights when they "fabricated" major misconduct charges against him.  Defendants attach copies of the misconduct reports and the hearing reports to their brief, which show that Plaintiff was found guilty of each charge following a hearing.  (*See* Defendants' Exhibits R, S, and U.)  The undersigned concludes that this claim is without merit on the basis of *Sandin v. Conner*, 515 U.S. 472, 115 S. Ct. 2293 (1995).  In *Sandin*, the Plaintiff alleged that prison officials deprived him of procedural due process by refusing to allow him to present witnesses during a disciplinary hearing and then sentencing him to segregation for misconduct.  *Sandin*, 515 U.S. at 474, 115 S. Ct. at 2294. In reversing the Ninth Circuit's decision that the prisoner had a liberty interest in remaining free of disciplinary segregation, the Supreme Court abandoned the search for mandatory language in prisoner regulations as previously called for under *Hewitt v. Helms*, 459 U.S. 460 (1983), and ruled instead that it was time to return to the due process principles which were established in *Wolff v.*

- 19 -

*McDonnell*, 418 U.S. 539 (1974), and *Meachum v. Fano*, 427 U.S. 215 (1976).  *Sandin*, 515 U.S. at 483, 115 S. Ct. at 2300 (internal citations omitted).

In *Sandin*, the Supreme Court noted that in some cases, a restraint might be so extreme as to implicate rights arising directly from the Due Process Clause itself.  *Sandin*, 515 U.S. at 483-484, 115 S. Ct. at 2300 (internal citations omitted).  In addition, the Court recognized that States may create liberty interests protected by the Due Process Clause where the freedom from restraint imposed "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484, 115 S. Ct. at 2300.  However, such restraints are rare and do not include, for example, transfer into solitary confinement.  *Sandin*, 515 U.S. at 486, 115 S. Ct. at 2301.  Nor does placement in administrative segregation normally constitute such a hardship.  *Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998); *Mackey v. Dyke*, 111 F.3d 460, 463 (6th Cir.), *cert. denied*, 522 U.S. 848 (1997); *Rimmer-Bey v. Brown*, 62 F.3d 789 (6th Cir. 1995). In addition, Plaintiff has no right to prison employment or to early release on parole.  *Greenholtz v. Inmates, Nebraska Penal and Correctional Complex*, 442 U.S. 1, 7 (1979); *Board of Pardons v. Allen*, 482 U.S. 369 (1987); *Sweeton v. Brown*, 27 F.3d 1162, 1164-65 (6th Cir. 1994), *cert. denied*, 513 U.S. 1158 (1995); *Newsom v. Norris*, 888 F.2d 371, 374 (6th Cir.1989).  Moreover, there is no right under federal law allowing a prisoner to prevent a transfer to another facility or giving him any choice concerning the facility where he will be incarcerated.  *Meachum*, 427 U.S. at 223-29[1]; *Olim v. Wakinekona*, 461 U.S. 238 (1983).

---

[1]    In *Meachum v. Fano*, 427 U.S. 215, 223-229 (1975), the Court held that transfers between prisons of different severity, such as between a medium security prison and a maximum security prison, did not deprive the prisoner of liberty within the meaning of the Due Process Clause.

A plaintiff seeking to allege a procedural due process violation based on a state created liberty interest must not only show it is derived from mandatory language in a regulation, but also that it imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484, 115 S. Ct. at 2300; *Rimmer-Bey*, 62 F.3d at 790-791.  Pursuant to *Sandin*, "a liberty interest determination is to be made based on whether it will affect the overall duration of the inmate's sentence, and there is no evidence here that the segregation will impact Plaintiff's sentence." *Jones*, 155 F.3d at 812.  The undersigned notes that Plaintiff is serving a life sentence.  (*See* Plaintiff's Offender Profile at http://www.state.mi.us/mdoc/asp/ otis2profile.asp?mdocNumber=179188.)  Therefore, Plaintiff's sentence is not subject to reduction by the accumulation of good time or disciplinary credits.  MICH. DEP'T OF CORR., Policy Directive 03.01.101, ¶ G (effective 12/01/04).  The Sixth Circuit has determined that a prisoner's placement in administrative segregation for over a year is not an atypical or significant hardship as to create a liberty interest in due process. *Mackey v. Dyke*, 111 F.3d 460, 461-63 (6th Cir.), *cert. denied*, 522 U.S. 848 (1997).  Because Plaintiff in this case fails to allege facts constituting an "atypical and significant hardship," the undersigned concludes that Plaintiff's claim that he was denied procedural due process is without merit.

Furthermore, Plaintiff's complaint, as well as the attached documents, establish that if Plaintiff had a right implicating the due process protections of the Constitution, Plaintiff received due process of law.  In all cases where a person stands to be deprived of his life, liberty or property, he is entitled to due process of law.  This due process of law gives the person the opportunity to convince an unbiased decision maker that, for example, he has been wrongly or falsely accused or that the evidence against him is false. *Zinermon v. Burch*, 494 U.S. 113, 127-28, 110 S. Ct. 975, 984 (1990).  The Due Process Clause does not guarantee that the procedure will produce a correct

decision. "It must be remembered that even if a state decision does deprive an individual of life, [liberty], or property, and even if that decision is erroneous, it does not necessarily follow that the decision violated that individual's right to due process." *Martinez v. California*, 444 U.S. 277, 284, n.9, 100 S. Ct. 553, 558, n. 9 (1980). "[T]he deprivation by state action of a constitutionally protected interest in 'life, liberty or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*." *Zinermon*, 494 U.S. at 125, 110 S. Ct. at 983 (1990) (emphasis in original). Further, an inmate has no right to counsel in disciplinary proceedings. *Wolff v. McDonnell*, 418 U.S. 539, 569-70, 94 S. Ct. 2963, 2981 (1974); *Franklin v. Aycock*, 795 F.2d 1253, 1263 (6th Cir. 1986).

Plaintiff claims that various Defendants violated his First Amendment right of access to the courts. Plaintiff alleges that on February 16, 2005, he sent a request to prisoner accounts for a certificate of prisoner account activity and affidavit, and informed Defendants Bauman and McBurney of his February 22, 2005, deadline in *Figel v. Mich. Dept. of Corrections* (Michigan Court of Appeals No. 2255457), because he was attempting to file an appeal in the Michigan Supreme Court. Plaintiff claims that prisoner accounting gave the documents to Defendant McBurney on February 18, 2005, but that Defendant McBurney did not bring the documents to Plaintiff to be signed and notarized until February 24, 2005. Plaintiff offers a copy of his certificate of account activity reflecting the above dates in support of this contention. (*See* Plaintiff's Exhibit C-609.)

Plaintiff further states that he sent a legal photocopy disbursement authorization to Defendant Salter requesting copies for his application for leave to appeal to the Michigan Supreme Court. Plaintiff informed Defendant Salter of his February 22, 2005, deadline, but these documents were returned to Plaintiff by Defendant McBurney on February 18, 2005, without copies being made. Plaintiff was not able to resubmit his request until February 22, 2005, because of "the holiday

weekend." On February 22, 2005, Plaintiff had Defendant Bauman take the documents back to Defendant Salter with a letter indicating that he needed them to be returned that afternoon, so that they could be placed in the mail by the end of business hours. However, Plaintiff contends that Defendant Salter intentionally held the legal documents until February 23, 2005, and then refused to make the copies, causing a further delay. Plaintiff states that the conduct of Defendants Salter, McBurney and Bauman caused Plaintiff to miss his deadline in the Michigan Supreme Court, so that Plaintiff was unable to appeal his state court decision. (*See* March 7, 2005, letter to Plaintiff from the Michigan Supreme Court Clerk, attached to Plaintiff's response to the motion for summary judgment as Exhibit C-612.)

It is well established that prisoners have a constitutional right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 821 (1977). The principal issue in *Bounds* was whether the states must protect the right of access to the courts by providing law libraries or alternative sources of legal information for prisoners. *Id.* at 817. The Court further noted that in addition to law libraries or alternative sources of legal knowledge, the states must provide indigent inmates with "paper and pen to draft legal documents, notarial services to authenticate them, and with stamps to mail them." *Id.* at 824-25. An indigent prisoner's constitutional right to legal resources and materials is not, however, without limit. In order to state a viable claim for interference with his access to the courts, a plaintiff must show "actual injury." *Lewis v. Casey*, 518 U.S. 343, 349 (1996); *see also Talley-Bey v. Knebl*, 168 F.3d 884, 886 (6th Cir. 1, 1999); *Knop v. Johnson*, 977 F.2d 996, 1000 (6th Cir. 1992); *Ryder v. Ochten*, No. 96-2043, 1997 WL 720482, *1-2 (6th Cir. Nov. 12, 1997). In other words, a plaintiff must plead and demonstrate that the shortcomings in the prison legal assistance program or lack of legal materials have hindered, or are presently hindering, his efforts to pursue a

nonfrivolous legal claim. *Lewis*, 518 U.S. at 351-353; *see also Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996).

In response to this claim, Defendants state that it was unreasonable for Plaintiff to expect to receive his requested documents and copies within three days. However, as noted above, Plaintiff claims that he made his requests on February 16, 2005, in order to comply with a deadline of February 22, 2005. Defendants fail to set forth any evidence showing that such a request was unreasonable or why they were unable to comply. Because there is a genuine issue of material fact with regard to Plaintiff's access to courts claims against Defendants Salter, McBurney and Bauman regarding the February 16, 2005, requests for documents and copies, the undersigned concludes that Defendants are not entitled to summary judgment.

Plaintiff also claims that the conduct Defendants Salter, McBurney, and Bauman was motivated by a desire to retaliate against him for filing grievances and lawsuits. In support of this claim, Plaintiff states that on February 24, 2005, he asked Defendant Miron why Defendant Salter continually harassed him when he requested copies. Defendant Miron responded that he had already talked to Defendant Salter several times and that she indicated she would stop harassing Plaintiff when he stopped filing frivolous litigation. In addition, Plaintiff states that he was transferred to the Baraga Maximum Correctional Facility (AMF) on February 25, 2005. On March 1, 2005, Plaintiff submitted the exact same photocopy request he had given Defendant Salter to the AMF librarian. Plaintiff was subsequently provided with the requested copies. Plaintiff claims that this proves that Defendant Salter was merely acting in retaliation when she denied his request for copies. Therefore, the undersigned concludes that there is a genuine issue of material fact regarding Plaintiff's retaliation claims against Defendant Salter. However, Plaintiff fails to allege any facts showing that

Defendants McBurney and Bauman acted because of a desire to retaliate against Plaintiff. Therefore, Defendants McBurney and Bauman are entitled to summary judgment on these claims.

In summary, in the opinion of the undersigned, Plaintiff has failed to sustain his burden of proof in response to Defendants' motion for summary judgment with regard to his claims that Defendants Suardini and Stasewich put poison and foreign objects in his food, his claims that Defendants Rankin, Irvine, Suardini and Seymour placed him in a cell with no ventilation and excessive heat, his claims that Defendants Savera and Charlebois denied his medications, his claim that Defendant Charlebois sexually assaulted him, his claims regarding threats, denial of dental floss and a bad haircut, his claims that Defendants McBurney and Bauman retaliated against him by interfering with his ability to obtain needed documents, and his due process claims against Defendants Savera, Saurdini, and Miron. However, because there is a genuine issue of material fact with regard to the remaining claims, Defendants' motion for summary judgment is properly denied with regard to Plaintiff's claims against Defendants Suardini and Seymour for tampering with his toilet, his retaliation claims against Defendants Bouchard, Stasewich, Savera, Irvine, Johnson, Semasky, Maxon, Suardini, McBurney and Miron for refusing to recommend Plaintiff for placement in the general population, his excessive force claim against Defendant Stasewich, his retaliation claim against Defendant Salter, and his access to courts claims against Defendant Salter, McBurney and Bauman. Accordingly, it is recommended that Defendants' Motion for Summary Judgment (Docket #57) be granted, in part, and denied, in part.

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal.

*United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985).

 /s/ Timothy P. Greeley
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE

Dated:  March 13, 2007